Below is an opinion of the court.

_____
PETER C. McKITTRICK
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In Re: | ) | Bankruptcy Case |
| | ) | No. 16-33185-pcm7 |
| PETER SZANTO | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| UNITED STATES TRUSTEE, | ) | Adversary No. 18-3022-pcm |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION[1] |
| PETER SZANTO, | ) | |
| | ) | |
| Defendant. | ) | |

The United States Trustee (Plaintiff or the UST) filed a complaint to deny Peter Szanto (Debtor) a discharge under 11 U.S.C. § 727.[2]  18-3022-pcm, Doc. 1.  For the reasons set forth below, Debtor will be denied a discharge.

---

[1]     This disposition is specific to this case and is not intended for publication or to have a controlling effect on other cases. It may, however, be cited for whatever persuasive value it may have.

[2]     Unless otherwise noted, all references to chapters, sections and rules are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., and to the Federal Rules of Bankruptcy Procedure, Rules 1001, et seq.

Page 1 - MEMORANDUM OPINION

Procedural Background

2        Plaintiff commenced this adversary proceeding approximately two

3    years ago, in early March of 2018.  Adv. P. 18-3022-pcm, Doc. 1 (the

4    Complaint).  Debtor filed a document in response to the Complaint that,

5    among other things, included allegations against additional individuals.

6    Adv. P. 18-3022-pcm, Doc. 32.  Because of certain irregularities with

7    that document, the Court entered an order, Adv. P. 18-3022-pcm, Doc. 41,

8    in which, among other things, it told Debtor that if he wanted to join

9    additional defendants, "he must do so in accordance with the requirements

10   of the Fed. R. Civ. P. regarding joinder, rather than merely including

11   allegations against third parties and serving his answer on said

12   parties."  Id. at p. 3.

13       Debtor eventually filed a document captioned First Amended 1)

14   Statement of Unwillingness to Consent to Entry of Final Orders 2) Demand

15   for Jury Trial 3) Affirmative Defenses 4) Admissions 4) [sic] General and

16   Specific Denials 5) Answer 6) Counterclaim (the Answer).  Adv. P. 18-

17   3022-pcm, Doc. 53.  Debtor purported to assert four counterclaims against

18   Plaintiff, Nicholas Henderson and Marissa Henderson in the Answer.  On

19   the same day he filed the Answer, Debtor filed a Notice of Joinder (the

20   Notice), in which he purported to join the Nicholas Henderson and Marissa

21   Henderson as indispensable parties.  Adv. P. 18-3022-pcm, Doc. 54.  The

22   Court entered an Order Re Notice of Joinder, Adv. P. 18-3022-pcm, Doc.

23   56.  In that order, the Court found that (1) filing a mere notice of

24   joinder was insufficient, (2) if the Notice was deemed a motion, it was

25   untimely and (3) if the Notice was deemed a timely motion, it would be

26   denied in its merits.  Id.

A few months later, I issued a letter ruling that addressed a motion filed by Plaintiff to dismiss the counterclaims asserted against the UST, and Debtor's demand for a jury trial and statement in the Answer that he did not consent to entry of final judgment. Adv. P. 18-3022-pcm, Doc. 139. I concluded that the Court lacked subject matter jurisdiction over the counterclaims against Plaintiff based on sovereign immunity, there is no right to a jury trial in a § 727 action, and Debtor's refusal to consent was irrelevant because the Court has jurisdiction and Constitutional authority to enter final judgment in this adversary proceeding. Id. Thereafter, the Court entered an order (1) dismissing Debtor's counterclaims against Plaintiff, (2) striking the jury demand and (3) stating that it "has the jurisdiction and Constitutional authority to enter final judgment in this matter." Adv. P. 18-3022-pcm, Doc. 140.

On January 21, 2020, I held a final pretrial conference (the Final PTC) at which I ruled on various pretrial motions filed by the parties. An audio recording of the Final PTC appears on the adversary proceeding docket as docket numbers 274 and 275. See also Adv. P. 18-3022-pcm, Doc. 276 (Order Regarding Pretrial Motions). Debtor failed to appear at the Final PTC. On January 28, 2020, Debtor filed a motion to stay the trial on the basis that the Court never provided him with notice of the Final PTC. Adv. P. 18-3022-pcm, Doc. 280. That contention is demonstrably false, for the reasons stated in the Court's order dated January 29, 2020. See Adv. P. 18-3022-pcm, Doc. 282.

At the time the trial in this adversary proceeding commenced, the only claims remaining to be tried were Plaintiff's claims to deny Debtor

a discharge under § 727.  Although the Complaint asserts eleven claims for relief, Plaintiff stated in its trial brief that it would pursue only six (its second, fourth, fifth, sixth, tenth and eleventh claims for relief).  <u>See</u> Adv. P. 18-3022-pcm, Doc. 250, p. 1, n. 1.  For the reasons explained below, I find that Plaintiff has met its burden of proof on each claim for relief upon which it relies.

There are numerous grounds to deny Debtor a discharge in addition to those I address below.  To the extent I do not discuss conduct relied on by Plaintiff at trial, that does not mean that the UST failed to meet its burden of showing that Debtor's discharge should be denied based on that conduct.  Debtor is a vexatious litigant and his conduct in the main bankruptcy case and numerous adversary proceedings, including this one, has put an immense burden on judicial and other public resources.  Considerations of judicial economy prevent me from making detailed findings on every factual basis established by Plaintiff for denying Debtor's discharge.

Analysis

Section 727 is construed liberally in favor of a debtor and strictly against the party objecting to discharge.  <u>In re Beauchamp</u>, 236 B.R. 727, 730 (9th Cir. BAP 1999).  The burden is on the plaintiff to show, by a preponderance of the evidence, that the requirements of § 727 are met. <u>Id</u>.; Fed. R. Bankr. P. 4005.  Section 727's purpose is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs.  <u>In re Cox</u>, 41 F.3d 1294, 1296 (9th Cir. 1994). "While the burden of persuasion rests at all times on the [plaintiff] objecting to the discharge, it is axiomatic that the debtor cannot

prevail if he fails to offer credible evidence after the [plaintiff] makes a prima facie case." <u>In re Devers</u>, 759 F.2d 751, 754 (9th Cir. 1985). <u>See also</u> <u>In re Hansen</u>, 368 B.R. 868, 876 (9th Cir. BAP 2007)(a debtor's failure to offer a satisfactory explanation is a sufficient ground for denial of discharge); 2 Barry Russell, BANKRUPTCY EVIDENCE MANUAL § 301.2 (2018)("The failure of a party to provide evidence peculiarly available to that party supports the inference that the truth would be damaging to that party.").

## I.   Section 727(a)(2)(B)[3] – Plaintiff's Second Claim for Relief

To deny a debtor a discharge under section 727(a)(2)(B), the plaintiff must show that:

(1) debtor transferred or concealed property;

(2) the property was property of the estate;

(3) the transfer or concealment occurred after the petition was filed; and

(4) debtor acted with the intent to hinder, delay or defraud a creditor or an officer of the estate.

<u>Devers</u>, 759 F.2d at 753-54.  The intent to hinder, delay or defraud must

---

[3]  Section 727(a)(2)(B) provides that the Court shall grant a discharge unless:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> * * * * *
>
> (B) property of the estate, after the date of the filing of the petition[.]

Page 5 – MEMORANDUM OPINION

be actual, as opposed to constructive, intent. However, intent may be inferred from the actions of the debtor and the surrounding circumstances. <u>In re Woodfield</u>, 978 F.2d 516, 518 (9th Cir. 1992); <u>Devers</u>, 759 F.2d at 753-54.

Plaintiff argues that Debtor's discharge should be denied under § 727(a)(2)(B) because Debtor (1) failed to disclose multiple financial accounts in his original bankruptcy schedules and statement of financial affairs (SOFA) and (2) created a new, undisclosed limited liability corporation (LLC) postpetition and secretly transferred estate assets to that LLC. Debtor's discharge will be denied on both grounds.

A. <u>Undisclosed Bank Accounts</u>

Debtor filed a voluntary chapter 11 petition on August 16, 2016. Case No. 16-33185-pcm7, Doc. 2. He filed his bankruptcy schedules and SOFA a couple of weeks later, on August 30, 2016. Exhibit 1.[4] Debtor's original schedules disclosed two Union Bank accounts that he used as his chapter 11 debtor in possession (DIP) accounts and an E*Trade account. <u>Id</u>. at p. 7.[5]

On September 20, 2017, the United States Department of Justice's Tax Division filed a Motion to Convert or Appoint a Trustee (the Motion to Convert). Case No. 16-33185-pcm7, Doc. 185. On December 5, 2017, I entered an order converting this case to chapter 7 (the Conversion Order) based, in part, on Debtor's failure to disclose estate assets. Exhibit 9.

---

[4] All references to an exhibit are to documents offered and admitted into evidence at trial.

[5] Debtor's DIP accounts with Union Bank ended in 2572 and 2580. Exhibit 26, p 25.

Page 6 - MEMORANDUM OPINION

In the conversion proceeding, I found that Debtor failed to disclose numerous financial accounts, including the following:

1. **Bank of America Account Ending in 2779**. Exhibit 26, p. 20. See also Exhibit 2, p. 1. The balance in this account on the petition date was approximately $1,300. Id. at pp. 1-3.

2. **Ford Interest Advantage Account Ending in 3843**. Exhibit 26, p. 22. See also Exhibit 2, p. 11. The balance in this account on the petition date was approximately $66,000. Id.

3. **HSBC Account Ending in 7256**. Exhibit 26, p. 24. See also Exhibit 2, p. 13. The balance in this account on the petition date was approximately $326,000. Id.

4. **Union Bank Account Ending in 8286**. Exhibit 26, p. 25. See also Exhibit 2, p. 23. The balance in this account on the petition date was approximately $102,000. Id.[6]

5. **Cathay Bank Account Ending in 7244**. Exhibit 26, p. 25. See also Exhibit 2, p. 9. The balance in this account on the petition date was approximately $166. Id.

(The Undisclosed Accounts).[7] Debtor's failure to list the Undisclosed Accounts in his bankruptcy schedules amounts to concealment within the meaning of § 727(a)(2)(B).

My finding in the conversion proceeding that Debtor concealed the

---

[6] In the conversion proceeding, I found that the Union Bank account ending in 8286 had approximately $50,000 on the petition date. That appears to have been an error. Instead, it appears from Exhibit 2 that the correct balance on the petition date was over $100,000.

[7] In the conversion proceeding, I found that Debtor failed to disclose at least seven additional accounts. See Exhibit 26, pp. 20-25. For simplicity's sake, I have omitted from this discussion accounts for which the balance on the petition date is not clear from the record and those that had a balance of less than $100 on the petition date.

Page 7 - MEMORANDUM OPINION

Undisclosed Accounts, and other findings that I will discuss below, apply

in this adversary proceeding by virtue of the doctrine of collateral

estoppel, also known as issue preclusion.[8]  Issue preclusion forecloses

relitigation of an issue if (1) the issue is identical to the one raised

in the prior litigation; (2) the issue was actually litigated in the

prior litigation; and (3) the determination of the issue in the prior

litigation was a critical and necessary part of the judgment in the

earlier action.  <u>Clark v. Bear Stearns & Co.</u>, 966 F.2d 1318, 1320 (9th

Cir. 1992).

The Undisclosed Accounts were property of the estate.  With certain

exceptions not applicable here, property of the estate is comprised of

"all legal or equitable interests" a debtor has in property as of the

petition date.  § 541(a)(1).  Property of the estate also includes:

> All interests of the debtor and the debtor's spouse in community
> property as of the commencement of the case that is-
>
>> (A) Under the sole, equal, or joint management and control of
>> the debtor; or
>>
>> (B) liable for an allowable claim against the debtor, or for
>> both an allowable claim against the debtor and an allowable
>> claim against the debtor's spouse, to the extent that such
>> interest is so liable.

§ 541(a)(2).  The Ford Interest Advantage Account Ending in 3843 is a

joint account owned by Debtor and his wife.  Debtor's is the only name

listed on the statements for the other Undisclosed Accounts.  <u>See</u> Exhibit

2.  I previously found in the conversion proceeding that Debtor was

---

[8]      In any event, at trial, Plaintiff provided independent evidence
of the Undisclosed Accounts discussed in this opinion.  That evidence is
compiled in Exhibit 2.  In addition, Debtor admitted at his deposition in
this matter that each of the Undisclosed Accounts was open on the
petition date.  <u>See</u> Exhibit 27, pp. 8-15.

required, but failed, to disclose the Undisclosed Accounts in his bankruptcy schedules because he because had a legal or equitable interest in each. I reaffirm that finding here.

Debtor concealed the Undisclosed Accounts after the petition date by failing to list them in his bankruptcy schedules and the monthly operating reports that he filed during his chapter 11 case. <u>See</u> Case No. 16-33185-pcm7, Docs. 33, 42, 49, 63, 64, 72, 82, 98, 107, 124, 134, 165, 197, 224, 277 (chapter 11 monthly operating reports signed by Debtor under penalty of perjury).

Finally, I find that Debtor acted with the intent to hinder, delay and defraud his creditors when he concealed the Undisclosed Accounts. In the conversion proceeding, I found that Debtor's misconduct in his chapter 11 case, specifically including concealment of the Undisclosed Accounts, was not the result of a long series of innocent mistakes, as Debtor continues to maintain. Instead, it was attributable to "a deliberate and concerted effort to withhold information" from his creditors and the UST. Exhibit 26, pp. 29-30. I reaffirm that finding here. The number of financial accounts concealed by Debtor and the amount of money involved "eliminate[s] any possible finding of mere negligence that could vitiate the inference of intent." <u>Devers</u>, 759 F.2d at 754. Debtor's intent to hinder, delay and defraud his creditors is also demonstrated by the fact that he has litigated, in this court and others, virtually every third-party subpoena issued by parties in interest seeking to obtain information about Debtor's finances in general and the Undisclosed Accounts in particular. Debtor's vigorous efforts to prevent the disclosure of information about his finances evidences an

intent to hinder, delay and defraud within the meaning of § 727(a)(2)(B).

Debtor offered conflicting testimony at trial about the Undisclosed Accounts. He testified at one point that the Undisclosed Accounts are community property. However, he also testified that, although his name appears on each of the Undisclosed Accounts, he had no interest in those accounts on the petition date because they were, in fact, his wife's accounts. According to Debtor, a California state court had assigned them to his wife as some type of preliminary division of assets in an ongoing dissolution of marriage proceeding. Finally, Debtor also testified that his name appears on the accounts only because his wife designated him a "pay on death beneficiary" of the accounts. There are a multitude of problems with Debtor's arguments.

As a threshold matter, Debtor's arguments that the Undisclosed Accounts are (1) community property and (2) his wife's separate property can not be reconciled. Moreover, Debtor's testimony that the Undisclosed Accounts are community property is contrary to a sworn statement Debtor made at the inception of this case that he and his wife have never "had joint/community/shared or combined property of any type[.]" Exhibit 1, p. 24. In any event, § 541 directs that community property is property of the bankruptcy estate. Debtor provided no evidence, other than his own testimony, which I do not find credible, that the California state court had assigned to his wife an ownership interest in the Undisclosed Accounts as of the petition date.[9] The bottom line is that, even if I

---

[9] Debtor offered one exhibit at trial. Exhibit A purports to be a docket sheet for a dissolution of marriage proceeding in California state court that remains open. Debtor did not provide this Court with any underlying case documents to support his contention that the California state court had assigned the Undisclosed Accounts to his wife
(continued...)

accept as true Debtor's testimony about the Undisclosed Accounts, which I do not, those accounts were property of the estate because Debtor had either a legal or equitable interest in the Undisclosed Accounts on the petition date.

B. Postpetition Creation of New LLC and Transfer of Funds

Debtor formed a new business entity, the Peter Szanto LLC (the LLC), in August of 2017, approximately one year after he filed his chapter 11 petition. Exhibit 15; Exhibit 26, p. 26 (making same finding in conversion proceeding). The LLC was property of Debtor's bankruptcy estate. § 1115(a)(1) (property of the estate in a chapter 11 case includes property debtor acquires after the petition date but before the case is closed, dismissed or converted).

Soon after he formed the LLC, Debtor opened an E*Trade account ending in 5272 in the name of the LLC (the LLC E*Trade Account) and transferred estate funds to the LLC. Exhibit 6; Exhibit 26, p. 26 (making same finding in conversion proceeding). From late September to mid-October of 2017, Debtor transferred approximately $367,000 in estate assets from one of his debtor in possession accounts to the LLC E*Trade Account. Exhibits 5, 6. Debtor did not report the formation of the LLC in his August monthly operating report. Case No. 16-33185-pcm7, Doc. 197. He also failed to report any of the transfers in his September and October 2017 monthly operating reports. Case No. 16-33185-pcm7, Docs. 224 and 277.

---

[9] (...continued)
on the petition date. Debtor testified at trial that the state court would not allow him to have any case documents until the dissolution case is concluded, even though he is a party to that case. Debtor's contention defies belief.

Page 11 - MEMORANDUM OPINION

I find that Debtor acted with the intent to hinder, delay or defraud his creditors when he secretly created the LLC and then made undisclosed transfers of estate property to it.  In the conversion proceeding, I found that Debtor's misconduct in his chapter 11 case, specifically including creating the LLC and making transfers of estate property to it, was not the result of a long series of innocent mistakes, as Debtor continues to maintain.  Instead, it was attributable to "a deliberate and concerted effort to withhold information" from his creditors and the UST. Exhibit 26, p. 29-30.  I reaffirm that finding here.

"Certain 'badges of fraud' strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears."  Woodfield, 978 F.2d at 518. Badges of fraud include a close relationship between the debtor and the transferee, and a transfer in anticipation of a lawsuit.  Id.

There is a close relationship between Debtor and the LLC.  He formed the LLC and is the only member listed on the formation documents. Exhibit 15.  Mr. Arnot, the former Chapter 7 trustee (Mr. Arnot or the Trustee) testified that Debtor is the only member of the LLC.[10]

The timing of the creation of the LLC is also suspicious.  In April of 2017, the Court entered an order granting the IRS's motion pursuant to Rule 2004 to require Debtor to produce all statements for any financial account in which he had an interest.[11]  Exhibit 26, p. 27.  Debtor did

_____

[10]    Mr. Arnot resigned as the chapter 7 trustee of this case on March 26, 2019.  Candace Amborn serves as the current chapter 7 trustee.

[11]    Rule 2004 provides, in pertinent part, that the court may order the examination of the debtor relating "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to

(continued...)

Page 12 - MEMORANDUM OPINION

not produce any statements for the Undisclosed Accounts in response to the Court's Rule 2004 Order. Id. It is likely that Debtor formed the LLC in response to investigations into his finances undertaken by the IRS and as an integral part of his plan to hide assets from his creditors. Moreover, the timing suggests that Debtor transferred estate funds to the LLC's E*Trade Account in reaction to the IRS's filing of the Motion to Convert on September 20, 2017. Case No. 16-33185-pcm7, Doc. 185. Debtor commenced the transfers just a few days later.

Debtor has not offered any convincing explanation for the creation of, or transfers to, the LLC. Debtor claims that he formed the LLC because the Court and the IRS instructed him to do so. I made no such instruction, and Debtor has never provided any detail or evidence to substantiate his contention. Debtor stated at trial that he intended to disclose the transfers of estate funds to the LLC's E*Trade Account, but was waiting until all assets of the estate had been transferred to make the disclosure. Debtor's explanations simply are not credible. Debtor was using the LLC in an attempt to hinder, delay and defraud his creditors.

For the reasons set forth above, Debtor will be denied a discharge under § 727(a)(2)(B).

II. Section 727(a)(4)(A)[12] - Plaintiff's Fourth, Fifth and Sixth Claims for Relief

To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff

---

[11](...continued)
the debtor's right to a discharge."

[12] Section 727(a)(4)(A) provides that the court shall grant a debtor a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account[.]"

Page 13 - MEMORANDUM OPINION

must show that "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." In re Roberts, 331 B.R. 876, 882 (9th Cir. BAP 2005).

"A false oath may involve a false statement or omission in the debtor's schedules." In re Wills, 243 B.R. 58, 62 (9th Cir. BAP 1999). A statement in a monthly operating report also constitutes a statement under oath for purposes of § 727(a)(4)(A), In re McKinney, 2012 Bankr. LEXIS 1704, *12 (Bankr. S.D. Ga. March 5, 2012), as does a debtor's sworn statement made at a Rule 341 meeting. In re Korte, 262 B.R. 464, 474 (8th Cir. BAP 2001).

A statement is material if it "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Wills, 243 B.R. at 62 (citing In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984)). "A false statement or omission may be material even if it does not cause direct financial prejudice to creditors." Wills, 243 B.R. at 63.

Fraudulent intent must be actual, not constructive, In re Jones, 175 B.R. 994, 1002 (Bankr. E.D. Ark. 1994), but "is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct." In re Retz, 606 F.3d 1189, 1199 (9th Cir. 2010).

A. Plaintiff's Fourth Claim for Relief

Plaintiff alleges that Debtor should be denied a discharge under § 727(a)(4)(A) because he knowingly and fraudulently made false oaths in his bankruptcy schedules and SOFA relating to the Undisclosed Accounts

and a closely held business entity, the Yankee Trust Corporation.  I agree.

### 1.   The Undisclosed Accounts

Debtor made a false oath relating to a material fact when he failed to list the Undisclosed Accounts on Schedule A/B of his bankruptcy schedules.[13]  See Exhibit 1, p. 7.  As I discussed above, Debtor concealed the Undisclosed Accounts as part of a comprehensive scheme to withhold assets and information about those assets from his creditors and the UST.  The omission of multiple financial accounts having material assets suggests that Debtor did not simply forget to include those accounts in his bankruptcy schedules.  Debtor acted knowingly and fraudulently when he failed to list the Undisclosed Accounts on Schedule A/B.

### 2.   The Yankee Trust Corporation

Debtor formed the Yankee Trust Corporation (the YTC) in 2014 and was its registered agent and a director.  Exhibit 26, p. 19.  He was also a 30 percent% owner at the time of formation.  Exhibit 24, pp. 116-17. Although Debtor claims that he transferred his ownership interest in the YTC to his family effective January 1, 2015, he remained a director on the date he filed his bankruptcy petition.[14]  Id. at p. 145.  Debtor testified that he formed the YTC to benefit his family and understands it to be a testamentary device under Massachusetts law.  As such, Debtor

---

[13]   Schedule A/B is the bankruptcy document on which a debtor must disclose all property in which the debtor has a legal or equitable interest.

[14]   Debtor also admitted under oath at the hearing on the Motion to Convert that, in January of 2016, he transferred $39,000 to the YTC and failed to disclose that transfer in his bankruptcy schedules.  See Exhibit 25, pp. 10-11.

Page 15 - MEMORANDUM OPINION

testified that there was always the possibility that the YTC could revert back to him.

Mr. Arnot testified that, despite Debtor's claim that he no longer had an ownership interest in the YTC on the petition date, Debtor made extensive use of YTC assets after he allegedly divested himself of an ownership interest, including during his chapter 11 case. Plaintiff's documentary evidence supports Mr. Arnot's testimony. <u>See</u> Exhibit 20. For example, in March of 2017, Debtor signed a check using approximately $7,937 of YTC funds to pay his mortgage. Exhibit 20, p. 58. In 2017, Debtor made multiple cash withdrawals from one of YTC's account. <u>See</u> Exhibit 20, pp. 58, 60, 63, 66, 69. Debtor also used a YTC credit card to pay for personal expenses, such as his homeowner's insurance. <u>See</u>, <u>e.g.</u>, Exhibit 20, p. 55. The address listed on YTC's credit card statement is Debtor's residence.

Debtor made multiple, material false oaths concerning the YTC in his bankruptcy schedules and SOFA. First, Debtor was at least a director of the YTC on the petition date. He was required, but failed, to report that interest in response to question 27 on the SOFA. <u>See</u> Exhibit 1, p. 44. Given Debtor's extensive use of YTC assets, I do not believe that he in fact transferred his ownership interest in the YTC to his family in January of 2015. Thus, he made a false oath by failing to report that ownership interest on Schedule A/B in response to question 19. <u>See</u> Exhibit 1, p. 7. However, even if Debtor really did transfer his ownership interest in the YTC to his family, which I do not believe, he made a false oath when he failed to disclose that transfer in response to question 13 of the SOFA. <u>See</u> Exhibit 1, p. 39. Finally, Debtor

testified he believed that the YTC is a testamentary device under Massachusetts law that gives rise to a reversionary interest. If Debtor believed that to be true, then he was obligated, but failed, to disclose that equitable interest in response to question 25 of Schedule A/B. <u>See</u> Exhibit 1, p. 9.

Debtor's testimony at trial in this matter, including about the YTC, was inconsistent, evasive and equivocal. On one hand, Debtor testified that he did not make use of assets held in the name of the YTC and that someone else, either his wife or one of his children, was responsible for his apparent use of those assets.[15] Later, Debtor appeared to admit that he made at least some of the transfers. He said he formed the YTC as a vehicle to teach his family about stock trading and when they had losses, he would "journal over money" to protect his family from financial losses. Debtor also testified that his failure to disclose his relationship to the YTC was simply the result of an innocent mistake and that no creditors had been harmed by the omission.

Debtor made the false oaths about the YTC knowingly and fraudulently. I have carefully considered Debtor's testimony and conclude it is entitled to no weight insofar as he tries to lay blame on others. Debtor has never, including at trial in this matter, offered any

---

[15] The YTC credit card statement reflects a charge for a hotel in Portland, Oregon on September 21, 2016. Exhibit 20, p. 53. That is the same day the Court held the initial case management conference in Debtor's then new chapter 11 bankruptcy case. Debtor attended that hearing in person. Debtor disputed at trial that the hotel charge was for his benefit because he lived in Portland then. As evidence of that fact, Debtor points to his sworn statement in his bankruptcy petition that he lived in Portland when he filed his bankruptcy petition. I have long been skeptical that Debtor lived in Portland on the petition date. Suffice it to say that the fact that Debtor made a sworn statement to that effect does not make it true or lessen my skepticism about Debtor's residency.

corroborative evidence to support his frequent attempts to shift blame to others. A debtor's "failure to produce available explanatory or rebutting evidence when the circumstances attending the transfer are suspicious" is indicative of fraudulent intent. <u>In re Titus</u>, 75 B.R. 256, 259 (Bankr. W.D. Mo. 1985). Debtor's failure to disclose his relationship with the YTC was not the result of an innocent mistake. Instead, Debtor concealed his relationship with the YTC because he wished to shelter assets nominally held in the name of the YTC from his creditors while, at the same time, retaining unfettered access to those funds for his own benefit. The administration of Debtor's chapter 7 case remains ongoing and it is far from clear that Debtor's actions have had no impact on his creditors. In any event, it is not necessary that a debtor's actions "succeed in harming creditors to warrant denial of discharge. . . ." <u>In re Bernard</u>, 96 F.3d 1279, 1281-82 (9th Cir. 1996).

Plaintiff has proved its case for denial of discharge under this claim.

B. <u>Plaintiff's Fifth Claim for Relief</u>

Plaintiff alleges that Debtor should be denied a discharge under § 727(a)(4)(A) because he knowingly and fraudulently made material false oaths during his chapter 11 case when he failed to disclose in his September and October 2017 monthly operating reports the transfers to the LLC discussed above in relation to Plaintiff's second claim for relief brought pursuant to § 727(a)(2)(B). I agree. My findings set forth above with regard to Plaintiff's second claim for relief support entering judgment against Debtor on Plaintiff's fifth claim for relief as well.

1    C.  Plaintiff's Sixth Claim for Relief

2        Plaintiff alleges that Debtor should be denied a discharge under

3    § 727(a)(4)(A) because he knowingly and fraudulently made a material

4    false oath at the initial Rule 341 meeting.  I agree.

5        Debtor admitted at trial that he testified under oath at his initial

6    Rule 341 meeting that his bankruptcy schedules were true and correct.

7    They were not close to being true and correct, for the many reasons

8    discussed above.

9        Debtor made the false oath knowingly and fraudulently.  Debtor

10   clearly knew that his bankruptcy schedules were not true and correct when

11   he testified at the Rule 341 meeting of creditors.  The number and

12   materiality of the inaccuracies in Debtor's schedules eliminates the

13   possibility of mere negligence or oversight.  In re Khalil, 379 B.R. 163,

14   175 (9th Cir. BAP 2007)(multiple omissions of material assets or

15   information support an inference of fraud if the nature of the assets or

16   transactions suggests that the debtor was aware of them at the time of

17   preparing the schedules and that there was something about the assets or

18   transactions which, because of their size or nature, a debtor might want

19   to conceal).  In addition, Debtor is no ordinary pro se debtor.  This is

20   Debtor's third bankruptcy case, and he testified that he has a masters

21   degree in business administration with a specialty in accounting and a

22   law degree.

23       For the reasons set forth above, Debtor will be denied a discharge

24   under § 727(a)(4)(A).

25

26

III.   Section 727(a)(6)(A)[16] - Eleventh Claim for Relief

Under this subsection of § 727(a), the plaintiff must prove "that the debtor (a) was aware of the order; and (b) willfully or intentionally refused to obey the order (i.e. something more than a mere failure to obey the order through inadvertency, mistake or inability to comply)." In re Clark, 525 B.R. 442, 463 (Bankr. D. Idaho 2015).  A discharge will not be denied when the debtor's failure to comply with a court order is because of inadvertence, inability or mistake.  The debtor's disobedience must have been intentional.  In re Jarrell, 129 B.R. 29, 33 (Bankr. D. Del. 1991); In re Dowell, 61 B.R. 75, 78 (Bankr. W.D. Mo. 1986).  Once the plaintiff has proved that the debtor violated a lawful order of the court, the burden shifts to the debtor to prove that he did not commit an objectionable act.  In re Reavis, 92 B.R. 380, 383 (Bankr. W.D. Mo. 1988).

Plaintiff argues that Debtor should be denied a discharge under § 727(a)(6)(A) because he refused to obey three separate orders of the Court.  I agree.

A.   The Court's Two Orders Concerning Conversion

The evidentiary hearing on the Motion to Convert commenced on Wednesday, November 29, 2017.  Exhibit 24, p. 1.  Debtor attended that hearing in person.  Id.  At the end of that day, the UST made an oral

---

[16]   Section 727(a)(6)(A) provides that the court shall grant the debtor a discharge unless

(6) the debtor has refused, in the case—

(A) to obey any lawful order of the court, other than an order to respond to a material question or to testify[.]

An order is lawful if it is issued by a court with subject matter and personal jurisdiction.  Maness v. Meyers, 419 U.S. 449, 459 (1975).

Page 20 - MEMORANDUM OPINION

motion to restrain Debtor from transferring estate property pending a decision on the Motion to Convert.  Id. at p. 246.  A long discussion ensued on the topic.  Id. at pp. 246-56.  Debtor voluntarily and repeatedly agreed to entry of an order restricting him from transferring funds among his various accounts or to third parties.  Id. at pp. 247-48, 252, 254.  I instructed the UST to submit an order, but made it clear that the restriction on transfers was effective immediately.  Id. at 251.  Debtor also stated, repeatedly, that he had already stopped all automatic transfers of funds:

> THE COURT: And if you're trading, you know, Cisco for Intel, that's fine.  It's not fine to be transferring money to HSBC or to -- and to the extent that's happening automatically, which I have my question as to whether it would, if it's happening automatically where --
>
> MR. SZANTO: No, no, no.  And -- and that's -- that -- that's -
>
> THE COURT: -- E*TRADE's just sending money to HSBC -
>
> MR. SZANTO: What's the whole -
>
> THE COURT: -- that needs to stop.
>
> MR. SZANTO: That, that's the whole point of -- Your Honor, that's the whole point of what I've tried to demonstrate here today, that, yes, they've discovered things that I was doing that appear to be improper.  I've offered my explanation and all of the things that were questionable, that were not being reported properly, I've taken steps to stop.  One of the problems with the E*TRADE was I had dozens of accounts.  There were dozens of accounts that were special purpose for very limited --
>
> THE COURT: All right.  Well, I'm -- my point is that I want to be sure that money's not being transferred --
>
> MR. SZANTO: Of course.  Of course.
>
> THE COURT: -- and if there's some way it's happening automatically to HSBC, that needs to stop.
>
> MR. SZANTO: Of course.  Of course.  And it has.
>
> THE COURT: Okay.
>
> MR. SZANTO: It -- it -- it stopped as soon as --

Page 21 - MEMORANDUM OPINION

THE COURT: Great.

MR. SZANTO: -- it was brought to my attention about how it looked.

MS. McCLURG: So –

MR. SZANTO: So that, that's already stopped. There was –

MS. McCLURG: Here's what I plan --

MR. SZANTO: -- nothing like that.

Id. at pp. 252-254.

The next day, on November 30, 2017, the Court entered an Order Limiting Transfer of Estate Property (the No-Transfer Order). Exhibit 8. With two exceptions not relevant here, the No-Transfer Order provides:

> The debtor and all entities the debtor directly or indirectly owns, controls, or uses to conduct business shall not transfer or cause the transfer of any property of the estate, including without limitation all funds held in bank, investment, or other financial accounts, to any other persons or entities or between such accounts[.]

Exhibit 8, p. 1.

The evidentiary hearing on the Motion to Convert resumed on Monday, December 4, 2017. Exhibit 25, p. 1. Debtor did not appear in person as expected, but I permitted him to appear via telephone. Id. at p. 4. At the end of that hearing, I announced that I would rule on the Motion to Convert the next day. Id. at p. 100. The UST responded that it had prepared a draft order for the Court in the event I decided to grant the Motion to Convert, which I ultimately did, and that Debtor should understand that the UST would ask that any conversion order immediately freeze, and allow the newly appointed chapter 7 trustee to exercise authority over, all of Debtor's financial accounts. Id. at pp. 99-100. At my instruction, immediately after the December 4 hearing adjourned,

the UST submitted to the Court and emailed to Debtor a draft form of order.  Case No. 16-33185-pcm7, Doc. 274.

The next day, I made extensive findings on the record, see Exhibit 26, and entered the Conversion Order.  The material terms of the Conversion Order are consistent with both the discussion that took place on the record on December 4 and with the UST's draft order.  The Conversion Order provides, in part:

> 4.  The debtor shall not use any property of the bankruptcy estate as defined in 11 U.S.C. §§ 541 and 1115, including without limitation all monies, funds, investments, and/or securities held or titled in the name(s) of the debtor or Peter Szanto LLC, Peter Szanto Company, Portland Trust Corp, and New Tahoe Corporation (collectively the "Related Entities").
>
> 5.  By December 19, 2017, the debtor must provide the Chapter 7 Trustee with the following:
>
> > * * * * *
>
> > b. An itemized accounting with documentation for all sums transferred during the chapter 11 to those entities owned and/or controlled by the debtor, including but not limited to the Related Entities;
>
> > c. Current account statements for all checking, savings and other financial accounts, including E-trade, in the debtor's name or the name(s) of the Related Entities and any other account in which the debtor owns and/or controls directly or indirectly; and
>
> > * * * * *
>
> 9.  The debtor shall cooperate with the Chapter 7 Trustee as necessary to enable the Chapter 7 Trustee to perform the Chapter 7 Trustee's duties under United States Code Title 11.
>
> 10. The debtor shall surrender to the Chapter 7 Trustee all property of the estate and any recorded information, including books, documents, records, and papers relating to property of the estate.

Exhibit 9.

There is no question that Debtor was aware of the No-Transfer and

Page 23 - MEMORANDUM OPINION

Conversion Orders. Debtor willfully and intentionally refused to obey those two orders in multiple ways.

Mr. Arnot testified that Debtor never provided him with the itemized accounting and financial statements required under paragraphs 5(b) and 5(c) of the Conversion Order and did not turnover to him all property of the estate as required by paragraph 10. Debtor's response is two-fold.

First, Debtor claims to have no financial account statements, including for the period of time his chapter 11 case was pending. I do not believe Debtor and, even if I did believe him, that would in itself likely be grounds to deny his discharge under § 727(a)(3).[17] Second, Debtor argued that he was excused from complying with the Conversion Order because the chapter 7 trustee could have obtained the documents via

---

[17] Section 727(a)(3) provides that a debtor shall be granted a discharge unless, among other things, the debtor has

> concealed, destroyed . . . or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case[.]

The debtor's justification will be measured against what a reasonable person would do under similar circumstances and will be evaluated in light of the education, experience and sophistication of the debtor, the nature and extent of the debtor's business, and the amount of credit extended to the debtor. Meridian Bank v. Alten, 958 F.2d 1226, 1231 (3d Cir. 1992). "[W]hen a debtor owns and controls numerous business entities and engages in substantial financial transactions, the complete absence of recorded information related to those entities and transactions establishes a prima facie violation of 11 U.S.C. § 727(a)(3)." In re Caneva, 550 F.3d 755, 762 (9th Cir. 2008).

It is inconceivable that Debtor's claimed failure to have even a single financial statement to provide to the Trustee could be justified under the circumstances of this case. Plaintiff alleged that Debtor should be denied a discharge under § 727(a)(3) in its fourth claim for relief. However, Plaintiff indicated in its trial brief that it would not pursue its § 727(a)(3) claim at trial.

Page 24 - MEMORANDUM OPINION

other means.  Specifically, Debtor maintains that the Trustee should have subpoenaed the relevant documents directly from the pertinent financial institutions.  Debtor's argument is completely without merit and indicative of his ongoing bad faith and vexatious abuse of the bankruptcy system.

The Conversion Order clearly requires Debtor to provide the Trustee with the specified documents.  That the Trustee *arguably* could have obtained the documents from other sources is beside the point and does not excuse Debtor's noncompliance.  Indeed, Debtor would have been obliged to provide the Trustee with the specified information upon the Trustee's request even if the Conversion Order had not specifically required it.  See Rule 4002 (requiring a debtor to cooperate with a trustee's administration of the bankruptcy estate).  "[C]omplete disclosure is the touchstone in a bankruptcy case."  In re Bernard, 99 B.R. 563, 570 (Bankr. S.D.N.Y. 1989).  Neither a chapter 7 trustee nor a debtor's creditors "should be required to engage in a laborious [and expensive] tug-of-war to drag the simple truth into the glare of daylight."  In re Tully, 818 F.2d 106, 110 (1st Cir. 1987).  Debtor has fallen far short of providing complete disclosure, and his failure to do so is attributable to a deliberate and concerted effort to withhold information he is obligated to disclose.[18]

_____

[18]    Section 727(a)(4)(D) provides that the court shall grant the debtor a discharge unless

(4) the debtor knowingly and fraudulently, in or in connection with the case—

* * * *

(D) withheld from an officer of the estate entitled to
(continued...)

Case 18-03022-pcm    Doc 288    Filed 03/18/20

Mr. Arnot further testified, in extensive detail, that Debtor willfully and intentionally violated the No-Transfer and Conversion Orders by making multiple transfers of substantial funds from December 1, 2017 - December 7, 2017.[19]  I find that those transfers provide multiple, independent and additional grounds upon which to deny Debtor a discharge under § 727(a)(6)(A).

For example, from December 1 - December 5, 2017, Debtor made three transfers totaling almost $278,000 from the LLC E*Trade Account, the existence of which he concealed during his chapter 11 case, to an HSBC account ending in 9269 (the HSBC 9269 Account).  The HSBC 9269 Account is one of the many accounts I found Debtor failed to disclose during the conversion proceeding.  See Exhibit 26, p. 23.  Debtor admitted under oath at the conversion hearing that the HSBC 9269 Account was open on the petition date, had funds, and that no one else had access to the account.[20]  Exhibit 24, pp. 186-87.  Debtor testified at the conversion proceeding that he did not disclose that account because he did not intend to use it anymore.  Id. at p. 187.  As is clear now, Debtor used

[18](...continued)
        possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs[.]

Plaintiff argues that Debtor should be denied a discharge under § 727(a)(4)(D) because, despite repeated requests, Debtor knowingly and fraudulently withheld from the Trustee the itemized accounting and financial statements required under paragraphs 5(b) and 5(c) of the Conversion Order.  I agree.

[19]    In addition to Mr. Arnot's detailed testimony, the transfers are documented in Exhibits 3 and 19.

[20]    The HSBC 9269 Account is not included in the list of Undisclosed Accounts I discuss above because the account balance on the petition date is not clear from the record.

Page 26 - MEMORANDUM OPINION

the HSBC 9269 Account to secretly move funds in an attempt to shield those funds from his creditors. Mr. Arnot testified to, and Plaintiff provided documentary evidence of, numerous other transfers in violation of the No-Transfer and Conversion Orders, including various global transfers.[21]

In response, Debtor claims that he did not violate the No-Transfer and Conversion Orders because he did not make the transfers. Debtor claims that the transfers all happened automatically in accordance with his proprietary trading software instructions because of the Trustee's alleged failure to properly monitor Debtor's accounts following entry of the Conversion Order. There are so many problems with Debtor's argument that it is difficult to know where to begin.

First, as is detailed above, Debtor repeatedly stated at the November 29, 2019, conversion hearing that he had already stopped all automatic transfers in his accounts. In any event, I do not believe that the transfers resulted automatically from preexisting trading instructions put in place by Debtor. This is not the first time that Debtor has made such a claim, but he has never provided any independent corroborative proof of the existence of such software. In fact, Mr. Arnot testified he asked Debtor to provide him with a thumb drive that contained the program, but Debtor refused to comply with that request.[22]

---

[21]    Mr. Arnot testified at length and in detail at trial that Debtor made global transfers of estate assets to HSBC Australia and Singapore in violation of the No-Transfer and Conversion Orders. Those transfers are documented in Exhibit 19. In addition, Debtor made two undisclosed global transfers of almost $100,000 each in June of 2017, approximately six months before entry of the Conversion Order. Exhibit 26, p. 26.

[22]    If the trading program exists, which I do not believe it does,
(continued...)

Debtor willfully and intentionally violated the No-Transfer and Conversion Orders when he initiated the transfers.  Finally, I have already addressed and rejected, multiple times in this bankruptcy case, Debtor's claim that Mr. Arnot mismanaged estate assets.  In any event, some of the transfers occurred before entry of the Conversion Order and cannot possibly be attributable to Mr. Arnot.

    B.  <u>The Court's Contempt Order</u>

    In late July of 2018, the Trustee filed a motion to hold Debtor in contempt for violation of the Conversion Order (the Contempt Motion).  Exhibit 17.  The Trustee asserted that he had been unsuccessful in his attempts to obtain Debtor's cooperation with the recovery of approximately $424,000 in estate assets that Debtor transferred to HSBC accounts in Australia and Singapore (the Foreign Accounts) shortly before and after entry of the Conversion Order.  <u>Id</u>.

    The Court held an evidentiary hearing and, on October 2, 2018, I entered an order granting the Contempt Motion (the Contempt Order).  Exhibit 10.  I found that Debtor's acts or omissions resulted in estate funds being transferred to the Foreign Accounts.  Case No. 16-33185-pcm7, Doc. 651, p. 4.  Although I declined at that time to determine whether Debtor made the transfers intentionally or whether they occurred automatically, I have explained above why I do not believe that the transfers that happened shortly before and after entry of the Conversion Order occurred automatically.  However, it is not necessary to decide that question for purposes of ruling on this claim for relief because the

---

[22](...continued)
it is property of the estate that Debtor is required to turn over to the Trustee, regardless of whether Debtor considers it to be proprietary.

Page 28 - MEMORANDUM OPINION

dispositive issue is Debtor's subsequent refusal to obey the Contempt Order's provisions requiring that he assist the Trustee in the Trustee's efforts to obtain information about and recover those funds.

The Contempt Order provides, in part:

> IT IS FURTHER ORDERED that the debtor shall sign copies of the Authorization to Disclose Financial Records [the Release Form] directed to HSBC Bank, as modified, and the Account Fund Transfer Forms with HSBC Bank Singapore Ltd. and HSBC Bank Australia Ltd., attached hereto as Exhibit 1, and deliver those signed copies to the Trustee no later than October 12, 2018[.]
>
> * * * * *
>
> IT IS FURTHER ORDERED that the debtor must surrender to the Trustee all funds that constitute property of the estate and take all actions and execute all such documents necessary to assist the Trustee in obtaining turnover of all property of the bankruptcy estate that was transferred to and/or on deposit with HSBC Bank Australia Ltd. and/or HSBC Bank Singapore Ltd. . . .

Exhibit 10, pp. 1-2. The Release Form authorizes HSBC Bank USA, Australia, and Singapore, and HSBC Foreign Exchange, to release account information to the Trustee and to turn over to the Trustee "all funds in all bank and/or financial accounts with your institution in [Debtor's] name solely, [or] jointly with another." Id. at p. 3.

Plaintiff argues that Debtor should be denied a discharge under § 727(a)(6)(A) because Debtor willfully and intentionally refused to obey the Contempt Order. I agree.[23]

---

[23] Plaintiff did not allege in the Complaint that Debtor's violation of the Contempt Order was a basis to deny his discharge, because the Complaint was filed before entry of the Contempt Order. However, Fed. R. Civ. P. 15, made applicable by Rule 7015, directs that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Plaintiff argued in its trial brief that Debtor should be denied a discharge under § 727(a)(6)(A) for violating the Contempt Order and Debtor did not object at trial to the introduction of evidence on the topic. Therefore, the question was tried with

(continued...)

1    Debtor was aware of the Contempt Order and willfully and

2 intentionally refused to comply with it.  Mr. Arnot testified that Debtor

3 refused to sign the Release Form and that, as a result, he was forced to

4 hire special counsel in Singapore to assist with the Trustee's efforts to

5 recover estate property.[24]

6    Debtor does not dispute that he has refused to sign the Release Form

7 and admitted at trial that he has participated in every hearing before

8 the court in Singapore, either in person or by phone, in opposition to

9 the Trustee's efforts there.  Debtor testified that he is justified in

10 refusing to comply with the Contempt Order because the money in Singapore

11 belongs to his wife, not to him.  Debtor testified that the money came

12 from his wife's Israeli military pension and was necessary to pay for a

13 recent liver transplant his wife had in Singapore.

14    I am skeptical about the veracity of Debtor's representations

15 concerning the nature of the funds in Singapore.  Debtor has never

16 provided any corroborative documentary or third-party testimonial

17 evidence to support his representations.  I have told Debtor numerous

18 times that he does not represent, and may not advance claims on behalf

19 of, his wife.  See, e.g., Doc. 651, p. 3.  I have also repeatedly assured

20 Debtor that if any funds are turned over to the estate from the Foreign

21 Accounts, it will not impact any right that his wife has under the

22 Bankruptcy Code and applicable federal rules with regard to those funds.

23 Id.  Even if I were to accept as true Debtor's unsupported, self-serving

24

25    [23](...continued)
Debtor's implied consent.  3 Moore's Federal Practice, § 15.18 (Matthew
26 Bender 3d Ed.).

   [24]    Mr. Arnot testified that he may have recovered the Australian
funds but not those in Singapore.

testimony that he did not comply with the Contempt Order because he feared the Trustee would seize funds necessary for Mrs. Szanto's medical care, which I do not, that is not a defense to the UST's claim in this matter. Debtor was still required to comply with the Contempt Order, because a lawful order must be obeyed unless and until it is reversed. Maness v. Meyers, 419 U.S. 449, 459 (1975). Debtor did not appeal the Contempt Order. An order of civil contempt issued in a main bankruptcy case, unlike in an adversary proceeding, is a final appealable order. In re Stasz, 387 B.R. 271, 272 (9th Cir. BAP 2008).

Under § 727(a)(6)(A), once the plaintiff has shown that the debtor violated a lawful order of the court, which the UST has done, the burden shifts to the debtor show why his discharge should not be denied. Debtor has not met that burden and his discharge will be denied under § 727(a)(6)(A) based on his wilful and intentional violation of the No-Transfer, Conversion, and Contempt Orders as detailed above.

### Conclusion

For the reasons set forth above, Debtor will be denied a discharge under § 727(a)(2)(B), (4)(A), (4)(D) and (6)(A). Counsel for Plaintiff should submit a judgment within 14 days of entry of this memorandum opinion.

                              ###

cc:  Peter Szanto (via ECF)
     Martin L. Smith (via ECF)